In the Matter of the Estate of HARRY WEINBERG, Deceased.

Surrogate's Court, Kings County, May 10, 1937.

*Louis D. Schwartz* [*Michael Weiner* of counsel], for Moscahlades Bros., Inc., and other creditors.

*Maurice C. Colton,* for the petitioner Kately Realty Corporation, creditor.

*William J. McArthur* [*Sunshine Ulman* of counsel], for the United States Fidelity and Guaranty Company, surety.

*Stephen L. Hoffman,* for Bessie Weinberg, as temporary administratrix and executrix.

*Sidney S. Goldstein,* for Jenny Green, a claimant.

WINGATE, S.   It is extremely improbable that when the learned judges of the Court of Appeals sought, by their decision in *Matter of Totten* (179 N. Y. 112), to bring order out of the semi-chaos of

previous pronouncements respecting the effect of so-called savings bank "trusts," that they possessed prophetic vision sufficient to enable them to foresee that the results of their opinion would be to revolutionize devolutionary technique among an appreciable proportion of the community and supply a new avenue of attempted escape from the primary obligations of citizenship and fair dealing.

The situation disclosed in the present case exhibits one of the varied instances of the increasing tide of transactions demonstrating the advisability of recognition of the savings bank trust in its true character as an alternate method of decedent devolution which, in certain aspects at least, is of essentially testamentary character. (Cf. *Matter of Reich*, 146 Misc. 616, 618, 619.)

The present decedent died on September 17, 1932. Prior to his death he was engaged in an active merchandising business at 65 Rivington street in the borough of Manhattan, and at the time of his decease owed various merchandise and other creditors for goods furnished to him in connection with the business, and rent in a sum which, if the claim presented to the temporary administratrix and executrix be taken as a criterion, aggregated $2,784. The fiduciary attempted summarily to dispose of all of these with the exception of that of the landlord by their flat rejection. Most of these claims being for small amounts, their holders apparently deemed prosecution less profitable than abandonment, and have consequently acquiesced in such repudiation. Certain of their number, however, apparently being made of sterner stuff, have challenged this disallowance. Hence the protracted litigation which has finally culminated in the hearing which has been had. It was thereon amply demonstrated that the following individuals had valid claims for debts, contracted by the decedent in the conduct of his business, in the following sums: Polly Brothers, $123.49; Alban & Co., Inc., $212.74; Bellos & Goldstein, $31; Moscahlades Bros., Inc., $160; Richard Schnibbe, Inc., $15.60, and Kately Realty Corporation, $1,244.05, giving a principal total of $1,786.88. To this sum must be added interest to the date of the decree (Civ. Prac. Act, § 480), which gives a grand total of approximately $2,300, plus costs of this proceeding, now due to these creditors of the deceased, whose claims have been allowed by the accountant, or the propriety of which has been judicially demonstrated; in other words, a sum which cannot fall far short of $2,500.

It is, of course, well established that the claims of creditors are postponed in payment to expenses of administration and funeral costs to a reasonable amount (*Meyer* v. *Cahen*, 111 N. Y. 270, 274; *Matter of Derry*, 161 Misc. 135, 140; *Matter of Matyasz*, 151 id. 370, 374; *Matter of Lanza*, 149 id. 95, 96; *Matter of Dimou*, Id.

83, 84, 85; *Matter of Smallman*, 138 id. 889, 892), wherefore the next step in the appraisement of the situation is an ascertainment of the sums of this variety which are properly payable.

Under the head of funeral expenses are to be classed the undertaker's bill of $284.50, expenditure of $200 for a burial plot and $175 for a monument, which gives a total of $659.50 on this score. The claim of $300 by Ida Schalbat for an alleged additional expenditure for burial plot is disallowed as increasing these expenses to an amount unreasonable in view of the condition of the estate.

Bond premiums are allowed in the sum of $60, as is the payment of $75 on account of services and disbursements to Stephen L. Hoffman, Esq., attorney for the accountant. The objections to other alleged payments to Louis Elegant and Samuel B. Neufeld aggregating $248.63 are sustained. Simultaneously herewith Mr. Hoffman has petitioned for a fixation of his fees under section 231-a of the Surrogate's Court Act and has requested the sum of $275. Since it appears that his out-of-pocket disbursements amount to $95 his request appears reasonable and his petition will be granted on the understanding that this amount is to be in full for all services to and including the entry of the final decree.

As a result of the foregoing, it is shown that the obligations of the estate, paid and unpaid, are: Administration expenses, $410; funeral expenses, $659.50, and debts, roughly, $2,500, or a grand total of approximately $3,569.50. As against this sum the executrix debits herself with $1,562.50, received by her as temporary administratrix. In other words, excluding from consideration such claims as she may have to commissions, the assets which she admits are sufficient only to pay the administration and funeral expenses and leave $492.59 for payment of the demonstrated claims of the creditors, which would give them about nineteen cents on the dollar of the obligations demonstrated to be properly due them, and defeat their just demands to the extent of approximately $2,100.

Although the decedent appears to have conducted a reasonably prosperous business which possessed a considerable stock in trade, the accountant debits herself with nothing on this account, asserting that she simply abandoned it. Whereas the testimony and demeanor of the accountant demonstrated that she was a wholly unreliable witness who was quite ready to perjure herself on the slightest provocation or with no reason whatsoever, so that a surcharge by $1,220, the value of the stock in trade at the time of the death would be readily possible, the view which the court takes of the main issue hereinafter considered, renders this course superfluous.

Prior to his death the decedent maintained four bank accounts with the Metropolitan Savings Bank; No. 166678 stood in his own

name and was quite inactive. It was opened on November 17, 1928, and up to the date of death (a period of almost four years), when it contained a balance of $20.14, showed only five withdrawals. The other three were carried in the name of " Harry Weinberg in trust for Bessie Weinberg." These were all active accounts, the most important, No. 166618, having been opened on November 10, 1928, and by transfer from a former account of the sum of $8,457. Between the 1st of July, 1929, and the date of decedent's death, thirty-one withdrawals, averaging almost one a month, were made. The total number of withdrawals from these three " trust " accounts during this period amounted to sixty-six, or at the rate of one for every seventeen days. The total sum so withdrawn aggregated $10,051.41. During the same period, thirty-one deposits, exclusive of interest credits, were made, substantially equivalent to one a month.

The only reasonable inference deducible from these facts is that the decedent elected to carry his regular business funds in these accounts in " trust " form, with the anticipation that, if he predeceased his wife, they would automatically devolve to her to the prejudice or defeat of his creditors. Under the rule of *Matter of Totten* (*supra*) they did so devolve to the extent of over $5,000, and the question presently propounded is whether this method of procedure is to be deemed effectual for the purpose of working a fraud upon the creditors of the decedent. In other words, may a decedent take advantage of the fiction of the " Totten trust " in a manner such as to permit a volunteer, who in reality is merely a donee of property on death, to receive a gift of upwards of $5,000 while at the same time the creditors of the donor, who have *bona fide* adjudicated claims, receive only dividends of nineteen cents on the dollar? If such be the case, it would indeed be a travesty on justice and the severest possible reproach to the laws of this State respecting tenure and devolution of property.

In order to defeat a result so outraging all dictates of propriety, the burden is cast upon the objectants of establishing the affirmative of three legal propositions, namely, *first*, that the act of the decedent in attempting in this manner to divert assets necessary for a solution of his debts amounted to a fraud on his creditors; *second*, that his personal representative, whether executor or administrator, possesses the right to disregard or take the necessary legal steps to set aside a conveyance of assets thus fraudulently transferred; and *finally* (a question which has not been raised in this proceeding by any party), that this court possesses the authority requisite for the awarding of a remedy.

In seeking the answer to the question first propounded, it will be of utility to recall the nature of such a savings bank " trust " as defined in *Matter of Totten* (179 N. Y. 112). This description is found at page 125. It consists of three sentences, which, for convenience in discussion, will be consecutively numbered. These are:

(1) " A deposit by one person of his own money, in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor."

(2) " It is a tentative trust, merely, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the pass book or notice to the beneficiary."

(3) " In case the depositor dies before the beneficiary without revocation, or some decisive act or declaration of disaffirmance, the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor."

In *Matter of Vaughan* (145 Misc. 332) this court attempted to analyze the meaning of the sentence which has been numbered " 2 " in the foregoing transcript, in the light of the decisions cited by the Court of Appeals as the apparent basis of that portion of the rule which it then enunciated under the guise of restatement. The present problem is concerned mainly with those numbered " 1 " and " 3."

The conception thus stated appears to be a mixture of the legal principles relating to gifts and those appertaining to trusts. In the second sentence the court refers to a completion of " *the gift* " thereby implying that the initial act of the depositor was in the nature of a donation, whereas in the third, the presumption of the creation of " an absolute *trust* " is stated to exist " as to the balance on hand at the death of the depositor."

Of course the actual operation of the transaction runs counter to basic principles both of gifts and trusts, since for validity in the former, absolute surrender of possession to the donee of the thing purported to be given is an essential element (*Leary* v. *Geller*, 224 N. Y. 56, 59; *Matter of Van Alstyne*, 207 id. 298, 308; *Vincent* v. *Rix*, 248 id. 76, 82; *Schwab* v. *Schwab*, 177 App. Div. 246, 248; *Matter of Moran*, 136 Misc. 615, 625), and in the latter there is an implication of the setting aside of a specified thing or fund, for the benefit of an identified person, in the hands of another who possessed well-defined active powers and is subject to established limitations in its care and use. None of these elements is present in any true and accepted sense in a so-called savings bank trust. The " trust " relationship springs into being as an

active matter only at its termination; the " trustee " is not expected to and from the nature of things never can perform any fiduciary duties in respect to the fund; and the fund in respect to which the " trust " is " presumed " to attach is a wholly fluctuating thing which is at all times subject to the caprice, to the extent of utter destruction, of the nominal " trustee." It is under his absolute control up to the moment of his death in like manner, and to the same extent, as any property of which he is the unqualified owner.

Why the Court of Appeals should have felt impelled to introduce into the transaction the wholly inapplicable terminology of a trust is not apparent, unless it was for the purpose of avoiding a modification of the dictum in *Gilman* v. *McArdle* (99 N. Y. 451, 461) that " It is only in respect to dispositions of property which are not to have any effect except upon the death of the owner and are revocable, that he is confined to a will."

Here is clearly an instance in which no disposition of the avails of the account is to take place except upon the death of the owner; they are at all times, during his continued life, subject to his unrestrained powers of invasion and disposal which in itself implies the power of complete revocation; yet it is not a will. The same applies to joint bank accounts in statutory survivorship form. (*Matter of Timko*, 150 Misc. 701, 704; *Matter of Curran*, 153 id. 630, 632.)

The only analogy of which the court can presently conceive which would conform to the actualities of the operation of a savings bank " trust " would be supplied by the act of an owner in placing money in a box and intrusting that box to an agent with directions that he, the owner, was to have unrestrained access thereto during his life, but at the instant of the drawing of his last breath, the agent should effect a gift of box and contents to the donee. Such is the practical substance of a " Totten trust " with the bank (with the assistance of the law) acting as the supposed agent and the bank book serving as the hypothetical box.

The question of whether the transaction is to be considered as a trust or a gift possesses considerable potential importance in many cases which are not only readily conceivable but are arising with increasing frequency. If it is to be deemed a trust in any sense even remotely approximating ordinary conceptions of trusts, it must presumably have been created at the time when the sole overt acts of the supposed settlor thereof were performed, which were at the opening of the account and at the times of the deposit of additional funds therein. Viewing the matter from the dates of the performance of such acts, the complications of proof in the

average case as to whether the acts then performed effected a fraud on creditors will be readily apparent since the question might well turn on the quantum of other assets possessed, and the aggregate of obligations owed, by the depositor on each of these occasions. If, however, the composite effect of the devolution of the ultimate avails of the account is to be viewed as essentially a gift through the medium of an agent, no such difficulties would arise, since its effectiveness must inevitably date from the time of its completion which is at the instant of the death of the donor.

The question here presented is much narrower than that involved in *Bodner* v. *Feit* (247 App. Div. 119) and its companion litigation of *Newman* v. *Dore* (250 id. 708), which latter, the court is informed, is now on its way to the Court of Appeals In these cases the issue was as to whether the transmission of the avails of a " trust " of this type was in effect a testamentary act in derogation of the rights of a surviving spouse under section 18 of the Decedent Estate Law. Whereas the affirmative determination by the Appellate Division in these decisions would seem to carry with it the implication that the devolution of the account was an act referable to the death of the depositor rather than to the date of its opening or the times of making deposits therein, on the theory that the greater must inevitably include the lesser, a contrary determination would not imply the opposite, since such contrary result would not amount to an affirmation that the transfer was not one *inter vivos* though substantially simultaneous with death.

Whereas, therefore, the present status or subsequent result of cases of the type of *Bodner* v. *Feit* are by no means conclusive as to the presently pertinent question, there are two decisions which have passed more or less directly on the present important question. The most recent, *Matter of Reich* (146 Misc. 616), decided by this court is, however, not directly in point, since the result there attained was predicated primarily on the rebuttal of the " presumption " of the creation of a " trust " referred to in the language of the *Totten* case.

*Beakes Dairy Co.* v. *Berns* (128 App. Div. 137), however, which was a unanimous determination by the Appellate Division of this department, is a directly pertinent pronouncement on this phase of the present discussion, determining that so far as creditors of the depositor are concerned, the effective moment of the devolution is that of his death. So important is this decision that somewhat extensive quotation of its reasoning appears appropriate.

It was an action by a creditor of the decedent to recover the amount of his claim from the avails of a " Totten trust " account

opened by the decedent in favor of his son. As in the present case, the money in the account was that of the decedent who had retained the bank book in his possession and withdrawn sums therefrom for his own purposes. His estate was insolvent. In reversing a judgment adverse to the creditor, the court remarked (at p. 138): " It is now settled in this State that the mere fact of one depositing his own money in his own name in trust for another in a savings bank does not prove a trust, the act being equivocal, *i. e.*, as consistent with some other intention, and, therefore, not probative of a trust; but that if the depositor happen to die on the way home, or at any time while the deposit account stands, then it is a trust, and a completed gift to the person named as *cestui* is made out."

The court thereupon quotes certain excerpts from the opinion of *Matter of Totten*, and continues: " It seems that the accident or fact of death turns that which may not have been and could not be found to be the intention of the deceased into his intention. But the gift is completed only at the instant of death. Up to that time the money is that of the depositor to draw out and do with it as he pleases. That being so it must be subject to his creditors during his lifetime, and for the same reason after his death also. One may no more get his money out of reach of his creditors after his death by depositing it in such a way, not to belong to his *cestui* until he dies, than he could do so by means of a will giving it to such *cestui*. His right to the absolute disposition of it during his lifetime makes it his and, therefore, subject to his creditors. As was said in a recent case, ' as to my creditors, property is mine which becomes mine for the asking, and no words can make an instrument strong enough to hold it for me and keep it from them ' (*Ullman* v. *Cameron*, 186 N. Y. 339). This was said, it is true, of a pretended trust provision for another in a will, but has just as strong an application to a scheme by which one tries to so fix his property that he may have the absolute control and disposition of it up to the time of his death, but keep it away from his creditors. The deceased did not even have to ask anyone; the money was in his own control."

Obviously, this decision is an absolute foursquare determination which is directly in point on the question now under discussion. It would be obligatory on this court to follow it. Its terse reasoning, sound common sense and unquestionable justice renders this course a distinct pleasure.

Even n the absence of this decision, the subsequently enacted provisions of article 10 of the Debtor and Creditor Law would

seem to require the attainment of a like result. Under the facts of this case, sections 274 and 275 possess especial pertinency.

It follows that the first demonstration essential to a recovery in the present instance has been made. The act of the decedent in attempting by the medium of these " Totten trusts " to divert to his wife, the present accountant, assets necessary for the solution of his debts amounted to a fraud on his creditors.

The second question thereupon arises as to whether his personal representative possesses the authority to disregard or take the necessary legal steps to set aside a conveyance of assets thus fraudulently transferred.

The question has been affirmatively answered on repeated occasions. (*Mc Knight* v. *Morgan*, 2 Barb. 171, 172; *Babcock* v. *Booth*, 2 Hill, 181, 184; *Lore* v. *Dierkes*, 16 Abb. N. C. 47, 54; *Brownell* v. *Curtis*, 10 Paige, 210, 218; *Bate* v. *Graham*, 11 N. Y. 237, 240; *Hangen* v. *Hachemeister*, 114 id. 566, 571; *McQuaide* v. *Perot*, 223 id. 75, 82; *Barton* v. *Hosner*, 24 Hun, 467, 470; *Wetmore* v. *Brooks*, 18 N. Y. Supp. 852, 853, not otherwise reported.) Whereas this authority has been said to have existed at common law (*Bryant* v. *Bryant*, 2 Robt. 612, 615), it seems more properly traceable to chapter 314 of the Laws of 1858 which has been continued without material change in the present section 19 of the Personal Property Law. This provides that " an executor, administrator * * * or trustee, may, for the benefit of creditors or others interested in personal property, held in trust, disaffirm, treat as void and resist any act done, or transfer or agreement made in fraud of the rights of any creditor, including himself, interested in such estate, or property, and a person who fraudulently receives, takes or in any manner interferes with the personal property of a deceased person, or an insolvent corporation, association, partnership or individual is liable to such executor, administrator, or trustee for the same or the value thereof, and for all damages caused by such act to the trust estate."

This leads naturally to the considerations affecting the third and final question of the jurisdiction of this court to award relief. It will be observed from the wording of the statute that the authority is accorded to the fiduciary to treat the fraudulent transfer as void, in so far as it affects adversely the right of any creditor. This carries with it the implication that, as to persons possessing such a status, the attempted transfer by the decedent was a nullity and ineffectual to divest title from him.

Since an estate fiduciary, except for obligations for administration and funeral expenses, is primarily a trustee for creditors

(*Blood* v. *Kane*, 130 N. Y. 514, 517; *Bankers Surety Co.* v. *Meyer*, 205 id. 219, 223, 224; *Agne* v. *Schwab*, 123 App. Div. 746, 747; *Matter of Schorer*, 154 Misc. 198, 200; affd., 248 App. Div. 666; affd., 272 N. Y. 247; *Matter of Dimou*, 149 Misc. 83, 87; *Matter of Lester*, 155 id. 536, 537), the grant to him of a cause of action for the recovery of property fraudulently transferred results in the vesting in him of a chose in action, for his dealings or neglects in respect to which his *cestuis que trustent* may call him to account in the tribunal of his appointment in like manner and to like extent as they may seek a surcharge against him for other misconduct or wrongful, negligent or fraudulent dealing with any other asset within his authority. It is his bounden duty to protect all valuable rights coming within his control, and failure to do so will result in his personal liability which may be enforced against him, as is here attempted, at the time of his accounting. (Cf. *Matter of Haber*, Delehanty, S., 151 Misc. 82, 84.)

In so far, therefore, as the avails of the savings bank accounts which came into her hands by reason of devolution pursuant to the rules of *Matter of Totten* were necessary for the satisfaction of the claims of the creditors of the decedent, the present accountant must be deemed to have received them in her fiduciary capacity and her failure to include them in her account to such extent furnishes a proper ground of objection and an adequate basis for surcharge by the creditors of the estate. (*McQuaide* v. *Perot*, 223 N. Y. 75, 82.)

Since the admitted assets of the estate are sufficient for the payment of its expenses for administration and funeral expenses and leave an overplus, which balance is not, however, enough to pay creditors and since the sums received by the accountant from the savings bank accounts are more than sufficient to supply the deficiency, the concrete decree to be entered will charge her with a sum sufficient to pay all such claims in full, with interest and costs.

Enter decree on notice in conformity herewith.